J-S35037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SCOTT KENNETH WILEY | : | |
| | : | |
| Appellant | : | No. 1522 MDA 2023 |

Appeal from the Judgment of Sentence Entered October 26, 2023
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0002762-2019

BEFORE: PANELLA, P.J.E., MURRAY, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED: DECEMBER 9, 2024**

Appellant, Scott Kenneth Wiley, appeals from the judgment of sentence entered in the Berks County Court of Common Pleas, following his jury trial convictions for involuntary manslaughter and aggravated assault.[1] We affirm.

The relevant facts and procedural history of this appeal are as follows:

> On March 11, 2019, Corporal Brian Myers of the Boyertown Police Department was summoned to 211 E. Third Street, Boyertown, Pennsylvania by Farrah Wertz for a domestic assault. Ms. Wertz spoke to the officer about an argument with [Appellant] and that she had an injured ankle as a consequence. At the time she spoke to the police officer, she was seated in a chair with her leg elevated and a bag of frozen vegetables on her ankle. [Appellant] came downstairs while the police officer was present and was taken into custody. [Appellant] indicated that he had been kicked in the eye and also had past eye injuries. The EMT saw swelling and discoloration of Ms. Wertz's ankle and

---

[1] 18 Pa.C.S.A. §§ 2504 and 2702(a)(1), respectively.

indicated she was in moderate discomfort.

Ms. Wertz was transported by ambulance to Pottstown Hospital where she was treated for a fractured fibula and then four days later underwent surgery at Phoenixville Hospital. On March 29, 2019, an ambulance was again summoned to the home of Ms. Wertz. She was in cardiac arrest. She was pronounced dead at Lehigh Valley Hospital at 9:02 a.m.

Dr. Samuel Land performed an autopsy on Ms. Wertz and determined that the cause of death was a pulmonary thromboemboli due to deep venous thromboses complicating blunt force trauma to her right lower extremity (or as more commonly described, she had blood clots in her lower leg that travelled to her heart and lungs) causing her death.

After the death of Ms. Wertz, the Berks County Detectives assumed investigation of the case. On March 30, 2019, the original responding officer, Brian Myers, arrived at work to find an envelope containing a voice recorder. The recording was provided by Xavier Wertz, the seventeen-year-old son of Farrah Wertz. Officer Myers gave the County Detectives the voice recording. Xavier Wertz indicated that before his mother went to the hospital on March 11, 2019, she told Xavier there was a recording. He had not looked for it prior to her death. Once he found it, he listened to a portion of it and then took it to the police. The recording was made by Ms. Wertz on March 11, 2019. The audio recording was played for the jury.

Donald Ellixson runs the Ellixson Tae Kwon Do Academy in Boyertown. Both Sedgwick Wertz, the daughter of Farrah Wertz, and [Appellant] were students at the Academy. Farrah Wertz also worked as a cleaner at the Academy to subsidize the lessons provided to her daughter. [Appellant] was a student for approximately three to six months. The Academy does not allow the use of striking by elbows, knees, nor sweeps, takedowns nor kicks to the back or face. Mr. Ellixson described a sweep as "one leg kicking the other leg out from under another person." He indicated that they are not performed at the Academy because they are unsafe and further, teaching them is more involved because you

have to teach the other party how to fall. Other schools do teach sweeps. Mr. Ellixson testified that if you are not trained to fall, a person could break their wrist, elbow, shoulder, ankle, shin bone, knee, ribs, spine or head. However, he admitted that he does not go into depth about the danger of sweeps. He only tells his students that you can get hurt when doing sweeps. [Appellant] did tell Mr. Ellixson that he had experience and was previously trained. However, because of difference in training at other schools, the Academy starts incoming students at the beginning and progresses them accordingly. [Appellant] was placed in a beginner class, but Mr. Ellixson described his skill level "somewhere around the middle of the road to advanced." At the Academy, [Appellant] earned a white belt having started at "no-belt." Kassandra Briggs-Wiley, the daughter of [Appellant], testified that she and her father took Tae Kwon Do mixed with kick boxing and ninjitsu lessons eighteen years earlier, and he earned three belts; white, green and orange.

On the date of the incident, [Appellant] admitted to having a bad argument with Farrah and that her twelve-year-old autistic son Octavian ("Tav") was exhibiting stimming behaviors because he was upset. He further testified that while attempting to hold down Tav's feet so socks could be put on him, Tav kicked [Appellant] in the eye repetitively. [Appellant] testified he had recently undergone eye surgery prior to the date of the incident. He was in pain and trying to stop Tav when Farrah yelled out that he ([Appellant]) broke her ankle. He believed he knocked her to the ground during this interaction only because Farrah Wertz told him that he had done so. He did not feel himself strike her. His testimony was that he did not stand and use any martial arts move on Farrah Wertz. During his interview with police, they told him some additional information they received from Ms. Wertz which led him to speculate that she may have fallen due to the uneven floor rather than him knocking her over while getting control over Tav.

(Trial Court Opinion, filed 1/29/24, at 3-6) (record citation omitted).

On July 9, 2019, the Commonwealth filed a criminal information charging Appellant with third-degree murder, aggravated assault, involuntary

manslaughter, and simple assault. Appellant filed an omnibus pretrial motion on September 24, 2019. Appellant's filing included a petition for writ of *habeas corpus*. In it, Appellant argued that the Commonwealth could not establish a *prima facie* case for third-degree murder or involuntary manslaughter. On February 12, 2020, the court conducted a hearing on the matter. At the conclusion of the hearing, the parties asked the court to "leave the record open" because they were having "some conversations" about submitting additional evidence. (N.T. Hearing, 2/12/20, at 63). Specifically, the Commonwealth wanted the court to consider the audio recording made by the victim on the day of the assault. The parties did not subsequently agree on whether the Commonwealth could submit the audio recording.

On July 31, 2020, the court conducted another hearing to evaluate the circumstances surrounding the victim's recording of the argument and assault. Following the hearing, the parties submitted briefs on the matter. In his brief, Appellant argued that the Commonwealth obtained the audio recording in violation of the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"),[2] which generally prohibits the interception of oral communications.[3] On

---

[2] 18 Pa.C.S.A. §§ 5701-5782.

[3] Appellant styled his brief as supporting a "motion to preclude the admission of audio recording of the assault." (Brief, filed 10/29/20, at 1). The trial court, however, characterized Appellant's filing as a suppression motion and disposed of it as such. (**See** Trial Court Opinion at 1, 6). Considering Appellant's arguments and the relief he sought, we agree with the court's
*(Footnote Continued Next Page)*

January 5, 2021, the court issued findings of fact, conclusions of law, and an order disposing of Appellant's pretrial motions. Regarding Appellant's request for *habeas corpus* relief, the court dismissed the charge of third-degree murder. Regarding Appellant's suppression motion, the court denied relief.[4]

Following trial, a jury convicted Appellant of involuntary manslaughter and aggravated assault. On October 26, 2023, the court sentenced Appellant to an aggregate term of four and one-half (4½) to twenty (20) years' imprisonment. Appellant did not file post-sentence motions. Appellant timely filed a notice of appeal on October 31, 2023. On November 6, 2023, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed his Rule 1925(b) statement on November 21, 2023.

Appellant now raises two issues for this Court's review:

> Whether the trial court erred in denying Appellant's motion to preclude evidence where the Commonwealth obtained an audio recording of the alleged assault surreptitiously recorded by the victim and without the knowledge or consent of Appellant in clear violation of [the Wiretap] Act and without establishing the exception to prohibition pursuant to § 5704(17) as the victim did not have a

_____

characterization of Appellant's arguments as a suppression matter. ***See Commonwealth v. Keller***, 823 A.2d 1004, 1012 (Pa.Super. 2003), *appeal denied*, 574 Pa. 765, 832 A.2d 435 (2003) (reiterating, "the remedy for illegally obtained evidence is suppression of the evidence").

[4] Thereafter, the Commonwealth filed a notice of appeal from the order dismissing the third-degree murder charge. On April 19, 2022, this Court affirmed the order. ***See Commonwealth v. Wiley***, 277 A.3d 1145 (Pa.Super. 2022) (unpublished memorandum).

reasonable suspicion that Appellant is committing, about to commit, or has committed a crime of violence as defined in § 5702?

Whether the Commonwealth failed to establish sufficient evidence to prove beyond a reasonable doubt the crime of aggravated assault when there was no direct or circumstantial evidence to prove the victim's injury was intentionally, knowingly or recklessly caused by Appellant?

(Appellant's Brief at 6).

In his first issue, Appellant asserts that the Wiretap Act generally "prohibits the interception, disclosure or use of any wire, electronic or oral communication." (*Id.* at 17) (quoting **Commonwealth v. Byrd**, 661 Pa. 85, 98, 235 A.3d 311, 319 (2020)). Appellant notes, however, that the Wiretap Act contains an exception, which allows a victim to intercept an oral communication if that person has "reasonable suspicion that the intercepted party is committing, about to commit or has committed a crime of violence," and there is reason to believe that evidence of the crime may be obtained from interception. (*Id.* at 19) (quoting 18 Pa.C.S.A. § 5704(17)). Appellant insists that this exception was inapplicable to the instant case because the victim did not reasonably suspect that Appellant was committing, or was about to commit, a crime of violence.

Appellant acknowledges that the Commonwealth presented witnesses at the suppression hearing, and these witnesses testified about Appellant's relationship with the victim. Nevertheless, Appellant maintains that the Commonwealth's evidence merely confirmed that he and the victim engaged

in verbal arguments, which resulted in an order under the Protection from Abuse ("PFA") Act.[5]  Appellant argues that "there is no reasonable inference from the testimony presented to support the notion that Appellant was going to escalate the prior threats to anything physical[.]"  (*Id.* at 24).  Further, Appellant relies on the recording for the proposition that the victim intercepted their conversation "because she believed another verbal argument was about to occur that was likely to result in more threats of violence rather than actual physical violence."  (*Id.* at 25).  For these reasons, Appellant concludes that the court erred in denying his suppression motion.  We disagree.

The following principles govern our review of an order denying a suppression motion:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.  Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous.  Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.  Thus, the conclusions of law of the courts below are subject to plenary review.

---

[5] 23 Pa.C.S.A. §§ 6101-6122.

*Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa.Super. 2017), *appeal*

*denied*, 647 Pa. 522, 190 A.3d 580 (2018).

This Court has explained that the Wiretap Act

> is a pervasive scheme of legislation which suspends an individual's constitutional rights to privacy only for the limited purpose of permitting law enforcement officials, upon a showing of probable cause, to gather evidence necessary to bring about a criminal prosecution and conviction. The statute sets forth clearly and unambiguously by whom and under what circumstances these otherwise illegal practices and their derivative fruits may be used.

*Commonwealth v. Glass*, 200 A.3d 477, 483 (Pa.Super. 2018), *appeal*

*denied*, 654 Pa. 507, 216 A.3d 226 (2019).

The Wiretap Act provides the following exception, which allows law

enforcement to utilize wiretaps without obtaining prior judicial approval:

> **§ 5704. Exceptions to prohibition of interception and disclosure of communications**
>
> It shall not be unlawful and no prior court approval shall be required under this chapter for:
>
> \* \* \*
>
> (17) Any victim, witness or private detective licensed under the act of August 21, 1953 (P.L. 1273, No. 361), known as The Private Detective Act of 1953, to intercept the contents of any wire, electronic or oral communication, if that person is under a reasonable suspicion that the intercepted party is committing, about to commit or has committed a crime of violence and there is reason to believe that evidence of the crime of violence may be obtained from the interception.

18 Pa.C.S.A. § 5704(17) (footnote omitted). The Wiretap Act contains a definition for "crime of violence," which includes "aggravated assault as defined in section 2702(a)(1) or (2)." 18 Pa.C.S.A. § 5702(1)(ii).

Instantly, the suppression court made the following findings of fact in conjunction with its ruling:

> 11. Prior to the assault on March 11, 2019, Ms. Wertz was in possession of an audio recording device. That device was turned on and recorded the argument and assault on March 11, 2019.
>
> 12. The parties agree that [Appellant] was unaware that an audio recording device was recording the argument and subsequent assault that occurred on March 11, 2019.
>
> 13. Xavier Wertz, the son of the Decedent, testified that his mother, Ms. Wertz, had told him that she began recording because "she said she felt like something bad was going to happen, and then she turned it on and then she put it down somewhere and that it was just recording the entire thing." (N.T., 7/31/20, at 10).
>
> 14. Xavier Wertz also testified that he has only ever observed verbal altercations between Ms. Wertz and [Appellant].
>
> 15. Julia Dennis, Decedent's friend, testified to several prior events and conversations with the Decedent regarding [Appellant's] verbal and physical abuse of the Decedent.
>
> 16. The Decedent filed a [PFA petition] against [Appellant] two months prior to the March 11, 2019 assault. In that PFA, the Decedent alleged [Appellant] threatened to stab her in the eye, threw things, walked in from the kitchen with a knife, stalked her, sent her threatening texts, and threatened her children.
>
> 17. Ms. Dennis testified that the Decedent told her after she filed the PFA that she was so in love with [Appellant] that she was willing to give him another chance.

- 9 -

18.     The Decedent subsequently petitioned for her PFA against [Appellant] to be withdrawn.

19.     [Appellant's] Exhibit 1 is an email from the Decedent to [Appellant] while the PFA was still active discussing the abusive behavior of [Appellant] and asking for them to reconcile their relationship.

20.     The Decedent and [Appellant] subsequently resumed residing together at the expiration of the PFA.

21.     [Appellant] testified that two to three weeks prior to March 11, 2019, [Appellant] and the Decedent discussed plans to take a trip to Gettysburg in the future.

(Findings of Fact and Conclusions of Law, filed 1/5/21, at 4-5).  Our review of the record confirms these findings.

Under the totality of these circumstances, the suppression court concluded that the victim "had a reasonable suspicion that a crime of violence was about to occur[.]" (*Id.* at 8).  We agree.  Moreover, when the intercepted statements are viewed in the context of Appellant's already-tumultuous relationship with the victim, we emphasize that the victim could have reasonably inferred that the argument would escalate into a crime of violence.[6]  *See* 18 Pa.C.S.A. § 5702(1)(ii); 18 Pa.C.S.A. § 5704(17).  Because

_____

[6] The record on appeal included the DVD containing the audio recording of Appellant's argument with the victim.  This Court reviewed the recording, which confirmed the suppression court's conclusions.  Initially, the parties are discussing the behavior of the victim's child, Tav.  (*See* Commonwealth's Exhibit 13 at 0:00-0:07).  The discussion immediately escalated into an argument where the parties traded insults.  (*Id.* at 0:07-0:42).  After a brief silence, Appellant escalated the matter by using coarse language.  (*Id.* at
*(Footnote Continued Next Page)*

the record supports the suppression court's conclusions, and its legal conclusions were correct, Appellant is not entitled to relief on his first issue. **See Ford, supra**.

In his second issue, Appellant asserts "that the evidence which was presented at trial was insufficient to establish that the injury to the victim was intentionally, knowingly, or recklessly caused" by Appellant. (Appellant's Brief

---

1:04-1:26). As Tav made noises in the background, Appellant complained about the victim's children. (***Id.*** at 1:27-1:52). The victim then spoke to Tav, informing the child that they were going to leave the residence. (***Id.*** at 1:53-2:00). Thereafter, the victim dealt with her child. (***Id.*** at 2:00-2:43).

The victim did not subsequently leave the residence. Instead, she took a phone call from Appellant's mother. (***Id.*** at 2:44). During the call, the victim complained about Appellant's behavior and his treatment of the children. (***Id.*** at 2:53-4:40). After the call, the victim prepared Tav to go for a walk. (***Id.*** at 4:41-5:10). Appellant interrupted, however, as he was angered by the victim speaking with his mother. (***Id.*** at 5:14-5:28). The victim told Tav to go downstairs. (***Id.*** at 5:29-5:30). Appellant told the victim, "Go fuck yourself, you tramp." (***Id.*** at 5:35-5:37).

The victim repeatedly commanded Appellant to get out of the residence, but Appellant responded with an even more aggressive tone. (***Id.*** at 5:49-6:39). The victim then stated, "Are you coming at me? You hit me I swear to God I'll call the police. Get away. Get away. Get away from me." (***Id.*** at 6:40-6:46). The victim then screamed. (***Id.*** at 6:46-6:48). At that point, Appellant claimed that Tav had kicked him. (***Id.*** at 6:50-6:55). Appellant asked the victim if she was going to stop Tav from kicking, and the victim responded, "No." (***Id.*** at 6:56-6:58). Following a rustling noise, the victim screamed in pain, instructed the child to call 911, and began to cry. (***Id.*** at 6:59-7:04). Appellant replied, "I gotta go." (***Id.*** at 7:05-7:07). The victim shrieked, "Get away from me," continued crying, and later exclaimed "You broke my fucking ankle." (***Id.*** at 7:09-7:26). Later, the victim explained to someone, "He just swept his feet under me. I think my ankle's broken. You need to come get him." (***Id.*** at 8:20-8:27). The parties kept arguing in this manner until the recording ended. (***Id.*** at 8:34-10:28).

at 26). Regarding the element of recklessness, Appellant insists that the "act of sweeping his leg under Ms. Wertz's … was not performed in a conscious disregard for a substantial and unjustifiable risk[.]" (*Id.* at 32). Appellant acknowledges that the Commonwealth provided some testimony about Appellant's martial arts training. Appellant maintains, however, that "no evidence was presented that he was virtually or even reasonably certain that death or serious bodily injury would be the likely and logical result of his conduct." (*Id.*) Moreover, Appellant emphasizes that he attempted to aid the victim after the incident, which is "contrary to any finding that he possessed the necessary mindset for aggravated assault." (*Id.* at 33). Appellant concludes that the Commonwealth presented insufficient evidence to support his aggravated assault conviction. We disagree.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that

the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

***Commonwealth v. Sebolka***, 205 A.3d 329, 336-37 (Pa.Super. 2019) (quoting ***Commonwealth v. Franklin***, 69 A.3d 719, 722-23 (Pa.Super. 2013)).

The Crimes Code defines aggravated assault as follows:

**§ 2702. Aggravated assault**

**(a)  Offense defined.**—A person is guilty of aggravated assault if he:

(1)  attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S.A. § 2702(a)(1).  The Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  18 Pa.C.S.A. § 2301.

"When a victim actually sustains serious bodily injury, the Commonwealth can, but does not necessarily have to, establish specific intent to cause such harm."  ***Commonwealth v. Burton***, 2 A.3d 598, 602 (Pa.Super. 2010) (*en banc*), *appeal denied*, 613 Pa. 641, 32 A.3d 1275

- 13 -

(2011). "[T]he statute's intent requirement can be met if the defendant acts recklessly under circumstances manifesting an extreme indifference to human life." *Id.* "[F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue." *Commonwealth v. Packer*, 641 Pa. 391, 406, 168 A.3d 161, 170 (2017) (quoting *Commonwealth v. O'Hanlon*, 539 Pa. 478, 482, 653 A.2d 616, 618 (1995)).

> In other words, the Commonwealth had to prove that [the defendant] acted with malice.
>
> To prove malice, it must be shown that the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm. This state of mind may be inferred from conduct, recklessness of consequences, or the cruelty of the crime.

*Commonwealth. v. Payne*, 868 A.2d 1257, 1261 (Pa.Super. 2005), *appeal denied*, 583 Pa. 681, 877 A.2d 461 (2005) (internal citations and quotation marks omitted).

Instantly, the trial court fully and correctly analyzed the relevant evidence as follows:

> The Commonwealth established that Farrah Wertz suffered a broken fibula on the outside of the leg near her right ankle that required surgery as a result of an incident involving [Appellant]. It was also uncontested that her death was ultimately linked to a complication from the injury. The main point of contention between the parties was how the injury occurred. The Commonwealth argued it was intentional conduct with an intent to injure by use of a "leg sweep" which caused Ms. Wertz to fall during an argument

with [Appellant] or at the very least he engaged in the kind of reckless conduct from which a life-threatening injury was almost certain to occur. The defense countered that the cause of her fall was unknown and if it was caused at all by [Appellant], it would have been accidental as he was reacting to being struck in his eye while recovering from a recent retinal surgery.

Sergeant Brian Myers of the Eastern Berks Regional Police Department had been dispatched for a "domestic in progress" at 211 East 3rd Street in Boyertown. He observed Ms. Wertz with her foot up with a makeshift ice pack when he arrived on the scene. He spoke with both [Appellant] and Ms. Wertz. Ms. Wertz was complaining about pain and swelling in her ankle and gave information about what occurred. [Appellant] told them that he had been kicked in the eye. No redness or swelling of [Appellant] was noted by police. EMS was dispatched and noted the swelling, discoloration and moderate discomfort of Ms. Wertz. Xavier Wertz, the teenage son of Ms. Wertz, arrived home prior to the arrival of police but after his mother's injury had occurred. He testified that upon his arrival, [Appellant] was upstairs blaring music. Xavier Wertz described the angry demeaner of [Appellant] as he walked around the upstairs on the phone with his mother while appearing to be packing his belongings. Sedgwick Wertz, Ms. Wertz's teenage daughter arrived home after her brother, and also testified to [Appellant's] demeanor, describing it as casual and contrasting it with her mother's upset … demeanor. Sedwick indicated she did most of [Appellant's] packing and that he patted her on the head and praised her for having done so. She did not note any injuries on [Appellant's] face.

At some point before Farrah Wertz left the house to be evaluated at the hospital for her injury, she told Xavier that there was a recorder. After her death, Xavier found the recorder, listened to a portion of it briefly and identified the voice of his mother, [Appellant], some noise from Tav, and someone who appeared to be on a phone. He turned it over to police. The person on the phone was later identified as [Appellant's] mother, Patricia Wiley. The approximately ten-minute audio recording, admitted as Commonwealth exhibit 13, was the highlighted evidence to establish what occurred between Ms. Wertz and [Appellant].

- 15 -

Sedgwick Wertz and Donald Ellixson both testified to [Appellant's] skill in martial arts as well as the practice and procedures in the martial arts academy. This also established the dangerous nature of a leg sweep being utilized on another person and that [Appellant] was aware of this as it was discussed with all students before they would spar.

The defense established that the first floor of the home where the argument took place was uneven. Xavier Wertz described it as 'very slopey' in between the dining room and living room … and had a raised carpet in a specific area. [Appellant] testified and referenced the timing of Ms. Wertz's statement about her ankle being broken as it corresponded to the recording. He highlighted that they had fought and then Tav became upset. He indicated he was holding down Tav's feet. [Appellant] further testified that when Farrah went to get Tav's shoes so they could leave, one of Tav's feet got loose and this was when he was kicked in his injured eye repetitively by Tav. He then asked for Ms. Wertz's assistance and she declined. At that point he grabbed Tav and pulled him to the ground. When [Appellant's] vision cleared, Ms. Wertz was once again at his side and indicated he broke her ankle. He apologized as from his perspective it was an accident, thinking it occurred while he was thrashing around during the incident with Tav. He offered to examine her leg and she told him to go upstairs. He returned to the first floor approximately three hours later and the police were there. Sedgwick Wertz confirmed that [Appellant] offered to examine her mother's ankle/leg and that he said he believed it was a sprain. Kassandra Briggs-Wiley testified that approximately 18 years before[,] she and her father took some Tae Kwon Do classes and he achieved only three belts and they stopped taking classes. At trial, [Appellant] testified that he did not recall knocking Ms. Wertz to the ground and denied any intentional push or other intentional conduct to knock her down. He testified he did not sweep her leg or utilize any martial arts move. He ultimately described what occurred as accidental.

(Trial Court Opinion at 8-10) (record citations omitted).

- 16 -

Viewing this evidence in the light most favorable to the Commonwealth as verdict winner, sufficient evidence supported Appellant's conviction for aggravated assault. *See Sebolka, supra*. Specifically, the evidence established that Appellant recklessly caused serious bodily injury to the victim under circumstances manifesting extreme indifference to the value of her life. *See* 18 Pa.C.S.A. §§ 2301, 2702(a)(1). In light of Appellant's experience with martial arts, his decision to utilize a leg sweep demonstrated a conscious disregard for an unjustified and extremely high risk that his actions might cause serious bodily harm. *See Payne, supra*. To the extent Appellant now relies on the defense evidence regarding his state of mind at the time of the assault, the jury was free to make its own credibility determination. *See Commonwealth v. Wright*, 314 A.3d 515, 524 (Pa.Super. 2024) (reiterating that weight of evidence is exclusively for finder of fact, who is free to believe all, none, or some of evidence and to determine credibility of witnesses). Therefore, Appellant's second issue on appeal merits no relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

*[signature: Benjamin D. Kohler]*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/09/2024